1
2
3
4

**IN THE CIRCUIT COURT OF THE STATE OF OREGON**

5

**FOR THE COUNTY OF MULTNOMAH**

6

| | |
|---|---|
| CASEY R. INGELS, | Case No. _____ |
| Plaintiff, | COMPLAINT |
| v. | Retaliation for Whistleblowing under ORS 659A.199; Aiding & Abetting under ORS 659A.030(g); Breach of Contract; Defamation; Wrongful Discharge; Employment Related Eviction in Violation of ORS 90.110(7) 91.120; Intentional Infliction of Emotional Distress; Failure to Pay Final Wages and Penalty Wages in Violation of ORS 652.140 and 652.150 |
| BECKLIN HOLDINGS, INC., dba ECS COMPOSITES, INC., and DENNIS STERLING BECKLIN, an individual, | |
| Defendants. | |
| | NOT SUBJECT TO MANDATORY ARBITRATION |
| | DEMAND FOR JURY TRIAL |
| | Prayer Amount: $4,580,459 |
| | Filing Fee $884 |
| | (ORS 21.160(1)(d)) |

7
8
9
10
11
12
13
14
15
16
17
18

**<u>INTRODUCTION</u>**

19

1.      Plaintiff Casey Ingels, the former President and CEO of defendant Becklin

20

Holdings, Inc., dba ECS Composites, Inc. ("ECS"), seeks monetary and injunctive relief based

21

on ECS and defendant Dennis Sterling Becklin's ("Sterling")[1] unlawful termination of plaintiff's

22

employment and related misconduct, including Sterling and ECS's additional post-termination

23

defamation and retaliation.

24

2.      Late in the afternoon of Wednesday, January 26, 2022, plaintiff emailed ECS's

25

majority owner, Sterling, warning of "substantial exposure" arising in particular from Sterling's

26

---

[1] Dennis Sterling Becklin is referred to in this Complaint as "Sterling" to differentiate him from his father, also Dennis Becklin, who is referred to in this Complaint as Becklin.

Page 1 –  **COMPLAINT**

financial dealings with Stubborn Mule LLC ("Stubborn Mule"), a company purchased and managed by a woman with whom Sterling was having an illicit extramarital affair. Plaintiff reiterated his concerns about the tax-free infusion of millions of dollars of ECS revenues into Sterling's girlfriend's failing business venture and regarding a related misrepresentation in Stubborn Mule's financial statements, along with other concerns. In addition to tax liability, the on-going diversion of ECS funds threatened ECS's line of credit. Plaintiff warned that it was like "watching a slow motion train wreck…."

3.      Despite the fact that Sterling previously had consistently, repeatedly, and effusively only praised plaintiff's performance in the strongest possible terms both in conversation and in writing, Sterling responded to plaintiff's email by deciding to immediately terminate plaintiff's employment – while not communicating that decision to plaintiff. Instead, over the course of the ensuing days while plaintiff was out of town for the weekend, Sterling unlawfully and without notice had the locks on plaintiff's residence changed; he also had the locks changed on the ECS headquarters building where plaintiff maintained his office.

4.      After taking these actions, Sterling engaged an off-duty Grants Pass Police captain to accompany him to meet plaintiff at the ECS headquarters on Sunday, January 30, 2022 to do the work of communicating Sterling's decision. Armed with a pistol protruding from his belt, the off-duty captain informed plaintiff that he was present in his "personal capacity." He told plaintiff that "someone is going to get hurt" before telling him, "You're fired." The officer showed plaintiff an email from a New York lawyer dated that same day – Sunday – asserting that plaintiff's employment was terminated purportedly for some unspecified "cause."

5.      When plaintiff turned to Sterling to ask him what the "cause" was, Sterling replied, "We don't know yet."

6.      Since the January 30, 2022 termination, and after learning that plaintiff was intending to assert this civil action, Sterling has initiated further retaliation and defamation, including by seeking in bad faith to initiate a bogus criminal investigation related to plaintiff

Page 2 –   **COMPLAINT**

BUCHANAN ANGELI ALTSCHUL & SULLIVAN LLP
921 SW Washington St., Suite 516
Portland, Oregon 97205
(503) 974-5015
(971) 230-0337 (facsimile)

1  attempting to access his own residence and office in the period before Sterling had notified

2  plaintiff of the termination of his employment.  When that effort failed, Sterling launched a

3  bogus investigation to attempt to find an after-the-fact rationale for the termination and to

4  intimidate plaintiff from filing this lawsuit, instructing staff that he had "hired Harvard educated

5  lawyers to sue" plaintiff for alleged misdeeds that he was seeking to manufacture.

## JURISDICTION

7       7.      This court has jurisdiction over plaintiff's claims for monetary and other relief

8  under Article VII, section 9 of the Oregon Constitution.

## VENUE

10      8.      Venue is proper in Multnomah County under ORS 14.080(2) because defendants

11 Becklin Holdings, Inc., dba ECS Composites, Inc. and Dennis Sterling Becklin conduct regular,

12 sustained business activity in Multnomah County.

## PARTIES

14      9.      Plaintiff Casey R. Ingels ("plaintiff") is a resident of Steilacoom, Washington.

15 During the relevant period, plaintiff was CEO and, for much of the time, President of ECS.

16 During that time, plaintiff maintained a residence in Grants Pass, Oregon, which ECS provided

17 to him as part of his compensation package.

18      10.     Defendant Becklin Holdings, Inc., is a Nevada LLC registered to do business in

19 Oregon; its principal place of business is in Grants Pass, Oregon.  ECS Composites, Inc. is an

20 assumed business name for Becklin Holdings, Inc.  ECS is a defense manufacturing company

21 that conducts regular, sustained business out of its headquarters in Grants Pass, Oregon.  ECS

22 conducts substantial business throughout the nation, including in Multnomah County, and holds

23 substantial contracts with the federal government.  ECS designs, manufactures, and sells rugged

24 military transit cases and related products including rackmount cases and reusable shipping

25 containers used by the armed services.

26

Page 3 –   **COMPLAINT**

11.     Defendant Dennis Sterling Becklin ("Sterling") is the grandson of the founder of Becklin Holdings, Inc.  Sterling owns a controlling share of Becklin Holdings, Inc., having received most of the shares from his father who ran ECS for 53 years.  Sterling is a resident of Grants Pass, Oregon.  Sterling's brothers own a minority interest in ECS but are not involved in the business.

## GENERAL ALLEGATIONS

12.     In early 2020, Sterling recruited plaintiff to become ECS's CEO.  Sterling was open about the fact that he lacked education (unlike his siblings, he had not graduated from high school or attended college) and experience, and that ECS was struggling and needed strong and effective leadership.

13.     Plaintiff is a military veteran, with a J.D. and M.B.A.  He is the former managing partner of a Tacoma, Washington law firm and has extensive experience running and working with closely held family companies.  At the time that Sterling recruited him, plaintiff was CEO of a defense apparel company in Lakewood, Washington and was residing in Tacoma.

14.     On or about April 9, 2020, plaintiff accepted an offer to begin working at ECS.  Under his four-year employment contract, plaintiff commenced employment as CEO on June 1, 2020 at a starting salary of $350,000 "to be reviewed in 6 months," at which time, under the written terms, both the "bonus structure" and plaintiff's elevation to a position on the board would be considered.  As part of plaintiff's compensation, ECS purchased a home in Grants Pass which, as alleged above, the company provided for plaintiff's use as part of his compensation package.

15.     After commencing employment, plaintiff was alarmed at the state in which he found ECS.  For example, he discovered that the company had been fraudulently working with two sets of books.  ECS would show only one set of books (one that was filled with inaccuracies) to the company's auditors.  The company had failed to pay taxes due.  In addition, Sterling himself was draining enormous sums of ECS's monies to fund his multiple failed ventures and

Page 4 –   **COMPLAINT**

expensive hobbies, including off-road vehicle racing and parachuting, and to directly fund his and his family's opulent lifestyles with infusions of ECS revenues.  It also became apparent that Sterling's failure to understand, manage or tend to basic business fundamentals had resulted in the employment of numerous employees who were brazenly taking advantage of the Becklin family's wealth.

16.     Plaintiff immersed himself deeply in the project of turning the company around, working long hours and through the weekends reconciling financial records, determining and paying tax liabilities, eliminating unnecessary and incompetent personnel, imposing accounting standards, bringing the company into compliance with applicable law, and substantially improving ECS's performance and trajectory.  To do so, plaintiff leveraged his relationships and contacts in the community of defense contractor companies, including his former employer and a related company, and brought in experienced, highly competent personnel to create a new team and help turn the company around.

17.     With the help of these contacts and former colleagues, plaintiff also obtained Top Secret/Sensitive Compartmented Information (TS/SCI) clearance for ECS personnel from the U.S. Department of Defense, one of the highest levels of security clearance in the federal government.  This clearance significantly expanded ECS's eligibility for military contracts.

18.     Through his contacts arising from his prior employment, plaintiff hired a new Director of Operations with TS/SCI clearance who managed within several months to bring in ECS's first prime contract with the federal government – a contract with the National Aeronautics Space Administration (NASA) to build a mobile ground station for NASA's Global Hawk program.  Prior to the NASA contract, ECS had only worked as a subcontractor for large defense companies who held the prime contracts with the federal government.

19.     In July 2021, plaintiff completed the process of securing a $41,000,000 contract with General Atomics, the largest contract that ECS had ever obtained.

BUCHANAN ANGELI ALTSCHUL & SULLIVAN LLP
921 SW Washington St.., Suite 516
Portland, Oregon 97205
(503) 974-5015
(971) 230-0337 (facsimile)

20.     Sterling lauded and rewarded plaintiff for his dramatic success.  At six months, Sterling placed plaintiff on ECS's board of directors, promoted him to President, and increased his annual salary to $500,000.

21.     Sterling sent plaintiff numerous text messages in which he extolled plaintiff and the work he was doing for ECS, frequently referring to plaintiff and his performance as "awesome."  He made similar comments in person and in front of others.  In at least two text messages during the final months of plaintiff's employment Sterling went so far as to text plaintiff, "I love you."

22.     In June 2021, Sterling texted plaintiff, "Dude, you're the epicenter of my life. Everything revolves around you.  And my Dad, he's so proud."  In another text that month Sterling praised plaintiff and the team of employees and experienced contractors he had assembled at ECS from his former work associations and elsewhere, saying "I'm so excited and proud of everyone you've surrounded me with.  It's awesome."

23.     On August 18, 2021, Sterling texted plaintiff, "Dude.  We're killing it! This has been the most educational year of my adult life…. I'm super happy with everything."  Sterling further stated, "Keep kicking ass, we're crushing it on all fronts right now."  He bemoaned how, in the past, before plaintiff was at the helm, meetings with the company's bankers were "embarrassing" due to the "clear lack of proper management."  Sterling noted that, "The business is in much better hands these days and I'm very proud of that."

24.     Throughout his employment, plaintiff sought to teach Sterling business fundamentals.  Sterling was openly insecure, making statements such as "I really do want to be an asset, not just some punk that inherited everything," as he put it in an August 2021 email to plaintiff.

25.     After plaintiff had successfully reclaimed for Sterling the prior CEO's 5% ownership interest in ECS, Sterling informed plaintiff that, in recognition of his efforts to date, he was giving that 5% stake to plaintiff.  Sterling acknowledged this reward in several

BUCHANAN ANGELI ALTSCHUL & SULLIVAN LLP
921 SW Washington St., Suite 516
Portland, Oregon 97205
(503) 974-5015
(971) 230-0337 (facsimile)

communications, including in front of ECS's Controller, Stephen French.  Prior to Sterling's transformation of ECS, in 2020, the prior CEO's 5% interest had been valued at $1,300,000. Today it is likely worth in excess of $2,000,000.

26.     After conferring the 5% ownership interest, in or around October 2021, while Sterling and plaintiff were on an elk hunting trip in Colorado, Sterling agreed to raise plaintiff's annual salary to $700,000, double the rate of compensation at which plaintiff had commenced employment just over a year earlier.

27.     Early in his employment, plaintiff had become aware of Sterling's extramarital affair with Sheri Johnson, the founder and Executive Director of Stubborn Mule.  Stubborn Mule is a manufacturer of parts used in a variety of weapons and other products, including AR-15 rifles.  The affair between Sterling and Johnson was an open secret at ECS.

28.     Through ECS, Sterling was paying Ms. Johnson's six-figure salary and was singlehandedly keeping the Stubborn Mule business that she was running afloat through improperly accounted for tax-free infusions of ECS funds.  ECS was funding that company's entire payroll and employee benefits for dozens of employees.

29.     Plaintiff expressed to Sterling his mounting concerns about Sterling's expenditure of large sums of ECS monies for purposes unrelated to the ECS business, including major outlays to the following entities: (1) Stubborn Mule; (2) an entity known as Becklin Land & Cattle, LLC which operated a major nearby ranch that Sterling had purchases, and (3) another entity Sterling was running with Johnson, originally known as EraThr3, which was later shortened to Era3.

30.     Era3, was described in marketing materials as "a company with a lifestyle wrapped around it" that was devoted to "cars, blades, gear, good booze, better tattoos, glory, resolve, off-roading, scandalous women, badassery."  Like Sterling's other ventures, Era3 consumed enormous sums of ECS revenues, but failed to earn appreciable revenues.  The company's product line consisted mostly of t-shirts.  Era3 kept several of Sterling's "friends"

BUCHANAN ANGELI ALTSCHUL & SULLIVAN LLP
921 SW Washington St.., Suite 516
Portland, Oregon 97205
(503) 974-5015
(971) 230-0337 (facsimile)

employed, so long as they remained in his good graces, but they produced little of value while churning through major infusions of ECS monies.

31.     Plaintiff warned Sterling that the transfer of monies from ECS to businesses not wholly owned by ECS without proper tax treatment could constitute tax fraud.  Plaintiff expressed concern that these ECS revenues were not being taxed as income but were instead distributed to these other entities which were not subsidiaries of ECS, without proper tax treatment.

32.     Other misuses of ECS funds, included Sterling's purchase of an approximately $150,000 "Baja truck" that he used in racing events which he claimed were a "marketing opportunity" for ECS.  Plaintiff objected that ECS did not have commercial items to sell, so it was difficult to understand how this could constitute marketing.  Based on this same rationale, Sterling expended large sums of ECS monies to fund his participation and that of an entire all-expense-paid team in a Baja racing event in Mexico.  Sterling also insisted that ECS sponsor his skydiving and motocross teams, including acting as the title sponsor for a national skydiving event in Arizona.

33.     During late 2020 and throughout 2021 plaintiff was also discovering how woefully Becklin Land & Cattle had been mismanaged and how extensively funds had been diverted to personal matters unrelated to ECS.  Becklin Land & Cattle, which was almost entirely supported by ECS funds, appeared to be funding Sterling's father, Dennis Becklin's, lavish lifestyle, including vacations on private planes, as well as the remodel of a Casper Point, California property, the maintenance and building expenses at Dennis Becklin's ranch in Bonanza, Oregon and Dennis Becklin's residence in Bandon, Oregon, as well as a collection of high-end vehicles.

34.     Even while plaintiff sought to transition Becklin Land & Cattle into a viable business as a training facility for U.S. Navy Seals and other elite fighters, Sterling continuously interfered by flouting regulations and pursing adolescent fantasies.  Sterling directed the ECS

Page 8 –   **COMPLAINT**

1    Director of Operations to illegally divert water on the Becklin Land & Cattle ranch; he instructed

2    him to have a ramp built into the canal to pull water out of the river.  However, the Director of

3    Operations, with support from plaintiff, refused to follow this directive.  Sterling also refused to

4    permit ECS's Director of Operations to take steps to comply with ATF regulations governing the

5    storage of ammunition and explosives which, among other things, require that they be stored at

6    least 100 yards from any habitable structure.  Sterling overruled the objections of his

7    subordinates and chose instead to illegally dump the explosives near actively used buildings,

8    including one of his own homes.  In addition, plaintiff became concerned with reports from his

9    Director of Operations that Sterling appeared to be diverting what little revenue Becklin Land &

10   Cattle produced through its contracts with the Department of Defense into his girlfriend's

11   business, Stubborn Mule.

12       35.    On one occasion, in December 2021, without plaintiff's prior knowledge, Sterling

13   and several of his buddies launched a hot air balloon wrapped in detonation cord from the

14   Becklin Land & Cattle property with Sterling and his friends on board.  After jumping out of the

15   balloon to begin parachuting down, they detonated the explosive cord, causing the balloon to

16   explode, scattering debris onto a neighbor's property.  Sterling subsequently claimed that this

17   venture was somehow a marketing event.  One participant remarked that they could not post the

18   video that they took of the event on-line, however, because the activity violated Federal Aviation

19   Administration (FAA) and Alcohol Tobacco and Firearms (ATF) regulations.

20       36.    Plaintiff expressed concern to Sterling about the potential impact of his actions on

21   ECS's status as a contractor to the U.S. Department of Defense, as well as Sterling's reputation

22   among ECS and Stubborn Mule employees.  Plaintiff continuously sought to reign in Sterling's

23   immature and over-indulged behaviors and to impose some order and structure on ECS and

24   Sterling's various failing ventures.  This included convincing Sterling to shut down Era3.

25       37.    Plaintiff also had to battle Sterling over his efforts to have ECS purchase him an

26   airplane.  The plane Sterling insisted on purchasing was a Pitts, an acrobatic plane that seats only

Page 9 –   **COMPLAINT**

the pilot and has no genuine business utility. Plaintiff was successful in keeping ECS funds from being used on that purchase. However, ECS still was called upon to purchase a hanger for the plane, despite the fact that the plane never made it to Grants Pass as Sterling had failed to maintain his pilots' license.

38.     Plaintiff also objected to Sterling's furnishing an expensive company vehicle to his daughter for her personal use, counseling Sterling that his daughter would need to be at least a part-time ECS employee for her to be able to legitimately be furnished a company car. Sterling resisted this direction, however, and chose not to have his daughter undertake any work for ECS, while continuing to allow her to maintain sole use of an expensive car for her personal use.

39.     Plaintiff was concerned that Sterling's distribution of millions of dollars in tax free money from ECS to his paramour's business and to himself and family members to fund their lavish lifestyles not only violated tax laws, it violated fiduciary duties to minority shareholders, which included both Sterling's brothers, who held a 20% interest in ECS and, given the grant of five percent, plaintiff himself. In addition, the draining of these substantial sums out of ECS increasingly jeopardized ECS's line of credit. Plaintiff sought to make the infusion of funds into outside entities more defensible by having these expenditures recategorized as loans supported by collateral, rather than undefined outlays of cash.

40.     During late 2021, plaintiff reported to Sterling that employees of ECS and Stubborn Mule had expressed concerns about what they believed was unlawful discriminatory favoritism of Johnson based on Sterling's on-going sexual affair with her. Plaintiff informed Sterling that his affair created potential employment law liability and that his financial largesse toward his girlfriend and Stubborn Mule created tax law liability and likely constituted breaches of Sterling's fiduciary duties.

41.     Sterling was at times resistant to plaintiff's efforts to impose structures, controls and procedures, and he vigorously resisted any second-guessing of his girlfriend and her failing business venture, Stubborn Mule.

Page 10 – **COMPLAINT**

42.     Nevertheless, Sterling continuously expressed his profound appreciation for the success plaintiff was achieving for ECS.  For example, in November 2021, Sterling texted plaintiff saying "I'm the luckiest guy alive.  Thanks for the leadership, ECS is shaping up to be so much than we ever thought possible."

43.     On December 13, 2021, Sterling texted plaintiff saying "I appreciate everything that you're doing.  It's awesome."  He added, "I'm really looking forward to the coming year, can't wait to knock a few more things down."

44.     In late December 2021, Sterling texted plaintiff expressing that he was "incredibly fortunate" adding, "Thanks for being awesome."

45.     On January 12, 2021, just 18 days before he precipitously fired plaintiff, Sterling texted plaintiff extolling his performance once again and referring to an initial introductory meeting in 2020 saying, "I'm so grateful that you met me in Portland for a beer." Sterling further noted that, before plaintiff took over leadership of ECS, "I was plagued with anxiety, frustration, and almost lost my willingness to fight."

46.     Despite the difficulty of obtaining information or control over Stubborn Mule that resulted from Sterling's relationship with Johnson, by late 2021, plaintiff had managed to secure sufficient information to have a Certified Public Accountant (CPA) review Stubborn Mule's financials.

47.     Once he received the results of the CPA's review in January 2022, plaintiff concluded that the situation was sufficiently dire that he had to put some of his concerns into writing.

48.     Late in the afternoon of Wednesday, January 26, 2022, plaintiff set forth some of his concerns in an email entitled, "Stubborn Mule Financials 2019, 2020, 2021."  Before sending the email, plaintiff discussed the contents with ECS Controller Stephen French.  French reviewed the email and agreed that plaintiff should send it as it was factually accurate.

Page 11 – **COMPLAINT**

Buchanan Angeli Altschul & Sullivan LLP
921 SW Washington St., Suite 516
Portland, Oregon 97205
(503) 974-5015
(971) 230-0337 (facsimile)

49.     In his January 26, 2022 email, plaintiff underscored his concerns about financial statements that falsely represented that Sterling's girlfriend had equity in Stubborn Mule, when, in fact, she had not contributed equity; rather she had simply received pay, benefits and infusions of capital from ECS.  Plaintiff detailed the fact that Stubborn Mule continued to have enormous losses and warned of "substantial exposure," referring both to tax and other legal liability arising from Sterling's misuse of ECS funds to prop up his girlfriend's failing business, and the obvious conflict of interest and breaches of fiduciary duties that these transactions represented.  Plaintiff warned: "It's a like watching a slow-motion train wreck."

50.     Plaintiff's temerity in putting concerns about Sterling's girlfriend's business into writing incensed Sterling, who decided to immediately fire plaintiff to silence and punish him.

51.     Even after making the decision to fire plaintiff, however, Sterling chose not to communicate his decision to plaintiff for several days, during which time he also did not respond to plaintiff's attempts to communicate with him by phone.

52.     On Saturday, January 29, 2022, French, the Controller, received a phone call from Sterling stating that "big changes" were going to happen "on Monday."  Sterling did not explain to what he was referring.  French relayed this information to plaintiff.

53.     Plaintiff attempted to contact Sterling by phone to understand what was happening.  Sterling did not respond.

54.     Plaintiff returned to Grants Pass early on Sunday, January 30, 2022 to attempt to find out what was going on.  When he arrived at his Grants Pass residence, he discovered that the locks on the house had been changed such that he could not get in.  When he arrived at work at ECS's office with Maegen Youngs, an administrative assistant whom plaintiff had called to inquire about the changed locks on his residence, his office key did not work.  Ms. Youngs' key to the building also did not work; consequently, she called a licensed and bonded locksmith.

55.     Shortly thereafter, Sterling arrived at ECS accompanied by a man with a pistol tucked under his belt who introduced himself as Jim.  Plaintiff recognized him as Jim Hamilton,

Page 12 – **COMPLAINT**

a Captain in the Grants Pass Police Department.  Hamilton's first comment to plaintiff was "someone is going to get hurt."  Upon questioning as to whether he was a member of the police department, Hamilton replied that he was present in his "personal capacity."

56.    Plaintiff asked Sterling what was going on.  Sterling provided no answer.  Instead, Hamilton replied by stating that plaintiff was fired "for cause."  Plaintiff responded to Sterling saying "you could have just told me that" – meaning before locking him out of his house and the ECS offices without any notification and before summoning an armed off duty police officer.

57.    Hamilton proceeded to show plaintiff an email from a New York lawyer that apparently had been sent that day, but which plaintiff had not seen, stating that plaintiff was fired for "cause."  The email did not explain what the alleged "cause" might be.  Instead, the New York lawyer's email vaguely asserted that he was currently investigating "various actions that you have taken" and warned that plaintiff should "be guided accordingly."

58.    Similarly, when plaintiff asked Sterling what the "cause" for termination was, Sterling replied, "We don't know yet."

59.    At the time of his termination, the 5% stake in the company Sterling had granted him months earlier had not been formally transferred to plaintiff.

60.    To date, ECS has not paid plaintiff his final wages owed, including unused accrued PTO.

61.    On Monday, January 31, 2022, Sterling held a meeting with ECS staff in which he tearfully announced that he had terminated plaintiff's employment.  While crying, Sterling explained that he had few people that he could trust and said he terminated plaintiff because "he was caught breaking in" to the ECS offices "with a sledgehammer," a false and defamatory claim that makes no sense on its face as the locks were changed and the email terminating plaintiff's employment was sent before plaintiff came to the office and found that he could not get in.  Thus, plaintiff plainly was not fired for seeking to access his office.  Sterling also was fully aware that no "sledgehammer" was involved in any way.  Moreover, if, as Sterling appeared to

Page 13 – **COMPLAINT**

be claiming, plaintiff had not already been fired at the time he sought to access his own office, doing so would not constitute any kind of offense.

62.     Sterling knew his statements indicating that he had fired plaintiff for seeking to "break in" to his office "with a sledgehammer" were false, but he made the assertions anyway to attempt to justify the termination decision to a staff that thought highly of plaintiff.

63.     Sterling further stated at the staff meeting on Monday, January 31, 2022 that he was now bringing in what he described as his "ninjas" who he explained were "Special Ops from Fort Bragg." Despite having just announced that he had fired plaintiff, Sterling went on to tearfully praise plaintiff, saying: "Thanks to Casey for everything he's done. Without Casey we would not be where we are today. The future is going to look amazing for ECS."

64.     The ECS offices were then commandeered by a group of severe looking armed security personnel who sought to intimidate staff. They announced that they were "investigating" and put signs up on the office and conference room doors stating, "NO ACCESS PERMITTED AT THIS TIME," underscoring the impression that plaintiff had been fired for committing some grievous offense.

65.     Also on January 31, 2022, Sterling announced that he had fired Ms. Youngs, who had worked as both Sterling's and his father's administrative assistant for years, as well as Director of Operations Ashley Hernandez. Both Youngs and Hernandez had information and had expressed concerns about Sterling's financial improprieties related to his extramarital affair as well as other compliance issues. In written communications to both Youngs and Hernandez, Sterling falsely claimed that their terminations were "layoffs."

66.     The Controller, French, resigned very shortly thereafter because he did not feel safe in the ECS office environment that was now under the control of the so-called "special ops ninjas."

67.     After Sterling received notice that plaintiff would be filing this lawsuit, including asserting claims under ORS 659A.199, Sterling took further retaliatory action, including seeking

Page 14 – **COMPLAINT**

BUCHANAN ANGELI ALTSCHUL & SULLIVAN LLP
921 SW Washington St., Suite 516
Portland, Oregon 97205
(503) 974-5015
(971) 230-0337 (facsimile)

1    to initiate a bogus criminal investigation into plaintiff attempting to gain access to his own

2    residence and office in the period before he received notice of the termination of his

3    employment.  On information and belief, Grants Pass Police and the Josephine County Sheriff

4    began contacting one or more parties purportedly to investigate plaintiff seeking to access his

5    own residence and his office, which Sterling intentionally falsely characterized as a crime.

6         68.     When this effort failed, plaintiff informed ECS staff that he had hired "Harvard

7    lawyers" to sue plaintiff and asserted or implied that plaintiff had stolen or diverted "millions of

8    dollars" from ECS and/or Sterling, an allegation which Sterling knew was false.  He informed

9    his staff that his lawyers had engaged a forensic accountant and stated or implied that this

10   accountant had determined that plaintiff had stolen from the company, a knowingly false claim.

11        69.     These post-termination actions were intended to stop plaintiff from and/or to

12   punish him for asserting his right to redress his unlawful termination through a civil action.

13   These actions were also part of an on-going effort to fabricate a pretextual basis for the

14   termination decision.

### FIRST CLAIM FOR RELIEF
**Retaliation for Whistleblowing in Violation of ORS 659A.199**
**Against Defendant ECS and Aiding & Abetting 659A.030(1)(g) Against Sterling Becklin**

17        70.     Plaintiff incorporates and realleges paragraphs 1-69 above.

18        71.     Plaintiff reported to ECS and Sterling information about what he in good faith

19   believed was evidence of a violation of a law, rule, or regulation.

20        72.     In particular, plaintiff reported that Sterling's infusions of millions of dollars of

21   ECS monies in the failing business which his girlfriend ran gave rise to tax law liabilities,

22   potential sexual harassment and discrimination liability, breaches of fiduciary duties including to

23   minority shareholders, and concerns about compliance with federal contractor requirements,

24   among other potential legal liabilities.  Plaintiff also noted concerns about the misrepresentation

25   in financial statements regarding Johnson having an equity interest in Stubborn Mule when, in

26   fact, she had merely been the recipient of ECS monies.

Page 15 – **COMPLAINT**

BUCHANAN ANGELI ALTSCHUL & SULLIVAN LLP
921 SW Washington St.., Suite 516
Portland, Oregon 97205
(503) 974-5015
(971) 230-0337 (facsimile)

73.    In his January 26, 2022 email, plaintiff detailed concerns about the "substantial exposure" that Sterling's infusion of monies to his paramour's failing business venture was creating for ECS and for Sterling.  Plaintiff noted that observing these improprieties and being powerless to stop them, was like "watching a slow-motion train wreck."

74.    In addition, plaintiff expressed concerns about Sterling's unlawful actions in the management and operation of Becklin Land & Cattle as alleged above.

75.    In retaliation for plaintiff's expression of good faith concerns regarding potential and actual violations of law, ECS and Sterling almost immediately terminated plaintiff's employment, unlawfully locked him out of his home without notice during the weekend of January 29, 2022 and, through Sterling's language and conduct, damaged plaintiff's reputation by both stating and implying that plaintiff had committed criminal acts and other serious impropriety.

76.    ECS's actions were intentional and constituted an unlawful employment practice in violation of ORS 659A.199(1).

77.    Sterling aided and abetted ECS's unlawful employment actions by materially participating in them.

78.    After receiving notice that plaintiff intended to redress Sterling and ECS's unlawful employment practices in civil litigation, Sterling and ECS engaged in further retaliatory action including engaging in additional defamatory comments and contacting law enforcement in bad faith to seek to initiate a bogus criminal investigation based on knowingly false and defamatory assertions regarding plaintiff seeking to access his own residence and the office of a company to which, as far as plaintiff knew at the time, he was still the President and CEO. Sterling also stated or implied that plaintiff had stolen or diverted "millions of dollars" from ECS and/or Sterling, which Sterling knew was false.

79.    As a direct and proximate result of ECS's and Sterling's actions as alleged herein, plaintiff has suffered economic losses in an amount to be proven at trial, but estimated to be no

Page 16 – **COMPLAINT**

less than $3,500,000, plus interest thereon at the statutory rate of 9%.

80.     As a direct and proximate result of ECS's actions as alleged herein, plaintiff has suffered noneconomic harm in the form of reputational harm, emotional and mental distress, degradation, embarrassment, and humiliation, for which plaintiff seeks compensation in an amount of $1,000,000.

81.     ECS's and Sterling's actions as alleged herein were intentional, extraordinary and willful, and were conducted with a knowing or reckless disregard to plaintiff's statutory rights. Such conduct exceeds the bounds of social toleration and is of the type that warrants imposition of punitive damages that may exceed the actual damages in this case.  Plaintiff intends to amend this Complaint to seek punitive damages pursuant to ORS 31.725

82.     Plaintiff is entitled to all appropriate injunctive relief.

83.     Plaintiff has engaged legal counsel to prosecute his claims and is entitled to his reasonable attorneys' fees and costs incurred, including expert witness fees, pursuant to ORS 659A.885 and ORS 20.107.

**SECOND CLAIM FOR RELIEF**
**Breach of Contract**
**Against Defendant ECS**

84.     Plaintiff incorporates and realleges paragraphs 1-84 above.

85.     Plaintiff and ECS had an enforceable contract as evidenced in writing for a four-year term of employment which commenced in June 2020.

86.     Plaintiff and ECS amended the contract to include additional compensation in the form of an increase in salary to no less than $700,000 per year as of late 2021, and transfer of a five percent ownership interest in ECS valued at approximately $2,000,000.

87.     Plaintiff worked diligently to benefit ECS, as requested by ECS, in reliance on ECS's promises of compensation and a 5% ownership interest.  He successfully performed the terms of his contract and secured substantial economic and reputational benefits for ECS, as well

Page 17 – **COMPLAINT**

BUCHANAN ANGELI ALTSCHUL & SULLIVAN LLP
921 SW Washington St.,, Suite 516
Portland, Oregon 97205
(503) 974-5015
(971) 230-0337 (facsimile)

as the largest contract in the company's history and its first ever prime contract with the federal government. Sterling repeatedly extolled plaintiff's performance up to the final weeks of his employment referring to plaintiff and his performance in text messages as "awesome" and stating that he "loved" him, among numerous other enthusiastic statements.

88.    Defendant ECS breached plaintiff's employment contract by terminating his employment in January 2022 without cause and by failing to provide plaintiff with the 5% ownership interest he already had earned and been promised.

89.    As a direct and proximate result of the breach of contract as alleged herein, plaintiff has suffered economic losses in an amount to be proven at trial, but which are estimated to be in excess of $3,500,000, plus interest thereon at the statutory rate of 9%.

90.    Plaintiff is entitled to all appropriate injunctive relief.

### THIRD CLAIM FOR RELIEF
### Defamation
### Against Defendants ECS and Sterling Becklin

91.    Plaintiff incorporates and realleges paragraphs 1-90 above.

92.    Defendant Sterling, acting in the course and scope of his agency for ECS, made defamatory statements and implications that were designed to harm plaintiff's professional reputation and to communicate falsely that plaintiff had engaged in serious improper and criminal conduct.

93.    Specifically, defendants falsely communicated to ECS personnel that plaintiff had attempted to break in to ECS offices with a sledgehammer. Sterling also falsely communicated that plaintiff had been fired for "cause" despite knowing that there was no such "cause." On information and belief, defendants have made assertions intended to create the impression that plaintiff engaged in improper financial transactions, including diverting or stealing "millions of dollars."

94.    Defendants changed the locks on plaintiff's home and office, brought armed law

Page 18 – **COMPLAINT**

BUCHANAN ANGELI ALTSCHUL & SULLIVAN LLP
921 SW Washington St., Suite 516
Portland, Oregon 97205
(503) 974-5015
(971) 230-0337 (facsimile)

enforcement to the office to communicate to plaintiff that he was terminated, hired security personnel who were described as "special forces ninjas from Fort Bragg" purportedly to "investigate" and find some after-the-fact rationale for the purported termination of "cause" and instructed ECS personnel that they were not to communicate with plaintiff.  Defendants questioned witnesses about transactions and purported not to know about transactions that were entirely legitimate and known to Sterling to give the impression that plaintiff had engaged in transactions on behalf of ECS that were somehow wrongful.  These actions gave rise to a false implication that plaintiff had engaged in unlawful and/or other serious misconduct.

95.    Once notified that plaintiff intended to bring a civil action to redress Sterling's unlawful conduct, Sterling engaged in further defamatory conduct in bad faith, including making a knowingly bogus report to law enforcement in bad faith, falsely asserting that plaintiff attempted to "break in" to his own office at a point when plaintiff had not yet been informed that his employment had been terminated, and stating or implying that plaintiff had committed some kind of financial impropriety.

96.    At the time he engaged in the actions alleged herein, Sterling was acting as an agent of ECS.

97.    As a direct and proximate result of defendants' actions as alleged herein, plaintiff has suffered reputational and economic losses in an amount to be proven at trial, plus interest thereon at the statutory rate of 9%.

98.    Plaintiff is entitled to all appropriate injunctive relief.

## FOURTH CLAIM FOR RELIEF
### Wrongful Discharge
### Against Defendant ECS

99.    Plaintiff incorporates and realleges paragraphs 1-98 above.

100.    Plaintiff fulfilled an important public duty and sought to protect important private rights related to employment by opposing practices that he believed in good faith to be in

Page 19 – **COMPLAINT**

violation of federal and state tax laws, federal and state laws governing employment discrimination, federal laws governing federal and Department of Defense contractors, and laws regarding the performance of fiduciary duties, including to minority shareholders, among others.

101.    Defendant ECS retaliated against and terminated plaintiff for fulfilling an important public duty and private rights related to employment as described above, including by discharging him.

102.    As a direct and proximate result of defendants' actions as alleged herein, plaintiff has suffered economic losses in the form of back pay, front pay, lost benefits, and out-of-pocket expenses, in an amount to be proven at trial, which is estimated to be $3,500,000, plus interest thereon at the statutory rate of 9%.

103.    As a direct and proximate result of defendants' actions as alleged herein, plaintiff has suffered noneconomic harm in the form of emotional and mental distress, degradation, embarrassment and humiliation, for which plaintiff seeks compensation in an amount to be determined at trial which is presently estimated to be $1,000,000.

104.    The actions of defendants as alleged herein were intentional, extraordinary and willful, and were conducted with knowing or reckless disregard to plaintiff's statutory rights. Such conduct exceeds the bounds of social toleration and is of the type that warrants imposition of punitive damages that may exceed the actual damages in this case. Plaintiff intends to amend this Complaint to seek punitive damages pursuant to ORS 31.725.

**FIFTH CLAIM FOR RELIEF**
**Violation of ORS 90.110(7) and ORS 91.120**
**Against Defendant ECS**

105.    Plaintiff incorporates and realleges paragraph 1-105 above.

106.    As an employee occupying employer-provided housing conditioned upon his employment, plaintiff was entitled to at least 24 hours' written notice of the termination of his employment before being evicted from his home under ORS 90.110(7) and ORS 91.120.

Page 20 – **COMPLAINT**

1    107.    Defendant ECS locked plaintiff out and evicted him from his home without

2    providing any notice of the termination of his employment, in violation of these statutes.

3    108.    Defendant ECS's conduct was willful and for no lawful purpose.

**SIXTH CLAIM FOR RELIEF**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**Against Defendant ECS and Sterling Becklin**

7    109.    Plaintiff incorporates and realleges paragraphs 1-108 above.

8    110.    Defendants' actions as alleged herein constitute intentional, extreme and

9    outrageous conduct that is beyond the bounds of conduct tolerated in a civilized society.

10    111.    This includes, without limitation: unlawfully locking plaintiff out of his house

11    without notice; on information and belief, entering his house without permission; lying to

12    employees about why he was discharged including claiming he had committed a crime; firing

13    him based on a pretext to cover up unlawful and improper activity; calling in armed special

14    operations forces in the wake of the termination, thereby further implying falsely that plaintiff

15    had engaged in criminal acts or acts that plaintiff posed some kind of safety risk; on information

16    and belief, initiating a criminal action in bad faith and making defamatory statements, including

17    statements in bad faith to law enforcement after learning that plaintiff was initiating a civil action

18    and, on information and belief, falsely stating or implying that plaintiff stole or diverted

19    "millions of dollars" from ECS and threatening to sue him to deter him from asserting his

20    statutorily protected rights.

21    112.    Based on defendants' conduct, plaintiff has suffered economic damages,

22    reputational damages, and emotional distress damages in an amount to be determined at trial but

23    estimated at $1,000,000.

24    113.    The actions of defendants as alleged herein were intentional, extraordinary and

25    willful, and were conducted with knowing or reckless disregard to plaintiff's statutory rights.

26    Such conduct exceeds the bounds of social toleration and is of the type that warrants imposition

Page 21 – **COMPLAINT**

of punitive damages that may exceed the actual damages in this case. Plaintiff intends to amend this Complaint to seek punitive damages pursuant to ORS 31.725.

**SEVENTH CLAIM FOR RELIEF**
**Violation of ORS 652.140 - Failure to Pay Final Wages**
**Against Defendant ECS**

114.    Plaintiff incorporates and realleges paragraphs 1-113 above.

115.    Defendant ECS failed to pay plaintiff all wages earned by the end of the first business day following the date it terminated his employment in violation of ORS 652.140.

116.    Pursuant to ORS 652.150, plaintiff is entitled to all compensation due plus a penalty in the amount of thirty days' wages.

117.    Plaintiff is entitled to prejudgment interest from the date each item of unpaid compensation became due and owing, pursuant to ORS 82.010.

118.    Plaintiff is entitled to reasonable attorneys' fees, expert fees, costs and disbursements incurred pursuant to ORS 652.200.

WHEREFORE, plaintiff prays for judgment against defendant as follows:

1.    For economic damages in an amount to be determined at trial but estimated at $3,500,000.

2.    For non-economic damages including damages for emotional distress humiliation, reputational injuries in an amount to be determined at trial but estimated at $1,000,000.

3.    For penalty wages for failure to pay all wages due upon termination in the amount to be determined at trial but estimated at $80,459.

4.    For punitive damages following amendment of the Complaint pursuant to ORS 31.725

5.    For attorneys' fees and costs expended in prosecution of this action.

Page 22 – **COMPLAINT**

BUCHANAN ANGELI ALTSCHUL & SULLIVAN LLP
921 SW Washington St., Suite 516
Portland, Oregon 97205
(503) 974-5015
(971) 230-0337 (facsimile)

1

Dated: March 22, 2022

BUCHANAN ANGELI ALTSCHUL
& SULLIVAN LLP

*s/Paul Buchanan*
Paul Buchanan, OSB 940551
paul@baaslaw.com
*Attorney for Plaintiff*

Page 23 – **COMPLAINT**

BUCHANAN ANGELI ALTSCHUL & SULLIVAN LLP
921 SW Washington St., Suite 516
Portland, Oregon 97205
(503) 974-5015
(971) 230-0337 (facsimile)